**Exhibit B**




Sent Via Federal Express

January 6, 2017

Mr. Matt Salzberg, CEO
Blue Apron
5 Crosby Street
New York, NY 10013

Re: www.blueapron.com, including Notice of Preservation Obligation

## FOR SETTLEMENT PURPOSES ONLY

Dear Mr. Salzberg:

We represent Access Now, Inc., its President, R. David New of Miami, Florida and Lisa Gathers of New Bedford, Massachusetts and other disabled individuals throughout the United States who access or attempt to access internet-based educational services, and whose rights to access those services are protected under the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). These individuals have disabilities that include: blindness and low vision, deafness and hearing loss, learning disabilities, cognitive limitations, mobility impairments, speech disabilities, photosensitivity and combinations of these.[1]

In addition, despite our representation of myriad disabled individuals in matters relating to the ADA, many federal courts have determined that a plaintiff who acts as a tester — someone who is a named plaintiff as opposed to someone who uses or frequents an establishment solely to partake of goods or services there — satisfies the standing requirements to sustain a lawsuit.[2] *See Heinzl v. Cracker Barrel Old Country Stores, Inc.*, No. 14-1455, DKT. No. 113, at 40-41 (W.D. Pa. Jan. 27, 2016) ("[T]he weight of authority is to permit standing to a plaintiff who acts as a tester."). Courts have explained that "anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion." *Id.* (citing *Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014). It is "incumbent upon [d]efendant to ensure that its facilities comply with the ADA, regardless of the possible motive (or motives) of individuals who visit them." *Id.* at 41.

Indeed, this rule serves the ADA's national mandate to eliminate discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). *See also Heinzl*, cited *supra*, at 41 ("[G]iven the remedial purposes of Title III and the role assigned by Congress to private enforcement of its provisions, the benefit of the doubt as to standing should be accorded even to the 'tester' plaintiff.") (quoting *Marradi v. Galway House, Inc.*, No. 13-10813, 2014 WL 1454266, at *4 (D. Mass. Apr. 15, 2014).

The United States Department of Justice ("DOJ") and various federal courts have concluded that businesses which offer goods and services to the public through websites are public accommodations that must comply with the general accessibility mandate of the ADA.

## ACCESSIBILITY FAILURES AND CONSEQUENCES

The international website standards organization — the World Wide Web Consortium ("W3C") — has published Version 2.0 of the Web Content Accessibility Guidelines ("WCAG 2.0" or the "Guidelines"). The Guidelines are widely recognized as setting the baseline requirements for website accessibility and have been used by the DOJ as a benchmark in settling website accessibility matters.

Our investigation reveals that your website, www.blueapron.com, has substantial access barriers. As a consequence of these failures, it is difficult or impossible for our clients and similarly situated stakeholders to access the site's privacy-related information and legal terms and conditions, and to exercise privacy and legal choices available to persons who enjoy full access to the website. These consequences are material to our clients and similarly situated stakeholders, particularly in light of the results of our evaluation of privacy-related and legal disclosures on the website, and our technical investigation of data collection practices.

Experts working with our clients have identified access barriers on your website as follows:

### W3C WCAG 2.0 Compliance Failures

**URL:** www.blueapron.com

### Web Content Accessibility Guidelines (WCAG-2)

| Checkpoint | Level | Checkpoint Title | # failed pages | % failed pages |
|---|---|---|---|---|
| 1.1.1 | A | All non-text content (with certain exceptions) presented to the user should have an equivalent text alternative. | 1,775 (of 1,797) | 99% |
| 1.2.1 | A | Alternatives that present the information in a way that sight or hearing impaired visitors can use must be provided for audio-only or video-only pre-recorded media presentations. | 1,774 (of 1,797) | 99% |
| 1.3.1 | A | Information about the meaning and structure of your content must be conveyed by more than the visual presentation of your content. | 1,780 (of 1,797) | 99% |
| 2.1.2 | A | If a user can move to a part of the page via the keyboard, the user must also be able to move away from it using only the keyboard | 1,774 (of 1,797) | 99% |
| 2.2.1 | A | If the content enforces a time limit, the user should be able to extend, adjust or disable it, unless the time limit | 1,785 (of 1,797) | 99% |

| | | | | |
|---|---|---|---|---|
| | | is part of a real time activity or would invalidate the activity. | | |
| 2.4.1 | A | A mechanism is available to bypass blocks of content that are repeated on multiple Web pages. | 1,774 (of 1,797) | 99% |
| 2.4.2 | A | Web pages have titles that describe topic or purpose. | 1,774 (of 1,797) | 99% |
| 2.4.4 | A | The purpose of each link can be determined from the link text alone or from the link text and its programmatically determined link context, unless the purpose of the link would be ambiguous to users in general. | 1,774 (of 1,797) | 99% |
| 3.1.1 | A | The default human language of each Web page can be programmatically determined. | 1,775 (of 1,797) | 99% |
| 3.2.2 | A | Changing the setting of any user interface component doesn't automatically cause a change of context unless the user has been informed before using the component. | 1,773 (of 1,797) | 99% |
| 3.3.2 | A | Labels or instructions are provided when content requires user input. | 1,774 (of 1,797) | 99% |
| 4.1.1 | A | In content implemented using markup languages, elements have complete start and end tags, are nested according to their specifications, don't contain duplicate attributes, and any IDs are unique, except where the specifications allow these features. | 1,773 (of 1,797) | 99% |
| 4.1.2 | A | The name and role of all UI elements can be programmatically determined; things that can be set by the user can be programmatically set; and notification of changes to these items is available to user agents, including assistive technologies. | 1,780 (of 1,797) | 99% |

We have already conducted a preliminary investigation working with prominent national experts and determined that your website has significant failures which limit accessibility for individuals with various disabilities. In addition to limiting equal access to goods and services, these accessibility failures — and Blue Apron's data practices — limit or deprive our clients and other stakeholders of rights and opportunities that other visitors at www.blueapron.com enjoy: access to privacy-related notices, opportunities to exercise privacy-related choices, and the ability to consent to legal terms and conditions to which Blue Apron claims to bind visitors to its website.

This letter notes the accessibility failures on your website and the privacy and legal consequences of those failures, and proposes a plan to work constructively with you, on behalf of our clients and

others similarly situated, to achieve equal accessibility for all disabled individuals who visit the site. In lieu of immediately filing a lawsuit in federal court, we are, in the first instance, proposing a collaborative approach that we have successfully utilized in this and other similar contexts to resolve claims for access to public accommodations by the disabled community. **To this end, we urge you contact us within twenty-one (21) days of receipt of this letter.**

## I. COUNSEL

Carlson Lynch Sweet Kilpela & Carpenter, LLP ("CLSKC") is a full-service civil law firm, with extensive national experience litigating disability cases. KamberLaw is the leading law firm in the prosecution of Internet privacy violations, and federal courts have acknowledged the firm's "recognized experience in complex litigation involving technology and privacy issues." Recently, CLSKC and KamberLaw have sought permanent injunctive relief for pervasive accessibility and privacy failures in the following federal actions involving digital access:

- *Parrish v. Sears Holdings Corp.,* Case No. 15-cv-05622 (W.D. Wash.) (setting forth ADA and privacy claims);

- *Guimaraes v. National Collegiate Athletic Association,* Case No. 15-cv-13378 (D. Ma.);

- *Jahoda v. Foot Locker, Inc.,* Case No. 15-cv-01000-AJS (W.D. Pa.);

- *Sipe v. Toys "R" Us, Inc.,* Case No. 15-cv-01037-AJS (W.D. Pa.) (setting forth ADA and privacy claims);

- *Jahoda v. Brooks Brothers, Inc.,* Case No. 15-cv-01050-AJS (W.D. Pa.);

- *Sipe v. Huntington National Bank,* Case No. 15-cv-01083-AJS (W.D. Pa.) (motion to dismiss and/or stay denied in its entirety);

- *Sipe et al v. ADIDAS America, Inc.,* Case No. 2:15-cv-01631-AJS (W.D. Pa.);

- *Sipe et al v. American Casino & Entertainment Properties, LLC,* Case No. 2:16-cv-00124-AJS (W.D. Pa.);

- *Jahoda v. Hard Rock Cafe International, Inc.,* Case No. 15-cv-01123-AJS (W.D. Pa.);

- *Jahoda v. The Pep Boys - Manny, Moe & Jack,* Case No. 15-cv-01124-AJS (W.D. Pa.);

- *Gross, et al. v. V.F. Corporation,* Case No. 15-cv-01172-AJS (W.D. Pa.);

- *Gross, et al. v. Ascena Retail Group,* Case No. 15-cv-01214-AJS (W.D. Pa.);

- *Sipe v. Red Roof Inns, Inc.,* Case No. 15-cv-01217-AJS (W.D. Pa.);

- *Jahoda v. Bassett Furniture Industries, Inc.,* Case No. 15-cv-01255-AJS (W.D. Pa.);

- *Jahoda v. National Basketball Association,* Case No. 15-cv-01462-AJS (W.D. Pa.);

- *Sipe v. Estee Lauder Companies, Inc.,* Case No. 15-cv-01571-AJS (W.D. Pa.);

- *Access Now, Inc., et al. v. Ace Hardware Corp.,* Case No. 15-cv-01626-AJS (W.D. Pa.); and

- *Sipe v. Fry's Electronics, Inc.,* Case No. 15-cv-01630-AJS (W.D. Pa.).

## II. LEGAL BASIS OF THE CLAIMS

### Accessibility

The DOJ has emphasized the need for accessible electronic and information technology — including websites — for disabled individuals.[3] The DOJ issued an Advanced Notice of Proposed Rulemaking regarding revising the regulations implementing Title III of the ADA in order to establish specific scoping requirements for making goods, services, facilities, privileges, accommodation or advantages offered by public accommodations via the Internet accessible to individuals with disabilities. In the fall of 2015, the DOJ announced that it does not expect to publish the Title III website accessibility Notice of Proposed Rulemaking until fiscal year 2018.[4,5]

Title III of the ADA imposes a general accessibility mandate upon Blue Apron insofar as it provides that "no individual shall be discriminated against on the basis of disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...."[6] "[T]he statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on websites over the Internet."[7] Congress unambiguously declared that it is discriminatory both to deny the equal opportunity to participate in a service and to provide services in a way that does not provide equal benefit.[8]

Coupled with this general obligation, Title III imposes specific obligations upon Blue Apron to ensure effective communication with its patrons. Specifically, Blue Apron is required to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[9]

The regulations implementing the ADA set forth numerous examples of appropriate auxiliary aids and services, including Braille materials and displays, screen reader software, and other means of making electronic information available to individuals with the types of disabilities listed in this letter.[10] Failure of your website to support these and other accessibility-assistive technologies is a violation of the ADA.

Federal courts have endorsed the DOJ's interpretation of the ADA in the context of web accessibility. *See, e.g., National Federation of the Blind v. Target Corporation*, 452 F.Supp.2d 946 (N.D. Cal. 2006) (denying motion to dismiss); 582 F.Supp.2d 1185 (granting motion for class certification); *National Federation of the Blind v. Scribd, Inc.*, 2015 WL 1263336 (D. Vt. Mar. 19, 2015) (denying motion to dismiss); *National Association of the Deaf v. Netflix*, 869 F.Supp.2d 196 (D. Mass. 2012) (denying motion for judgment on the pleadings). Thus, there is little doubt that the Title III accessibility requirements apply to websites. *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

Numerous state laws also protect consumers' privacy rights affected by their dealings with websites. These laws include "baby UDAP" statutes modeled on the Federal Trade Commission Act, which prohibit unfair and deceptive acts and practices. These laws are implicated by conduct such as described above, especially where a website that purports to offer privacy notice and choice does not extend them to the individuals such as those we represent. Such conduct deprives our clients of opportunities enjoyed by other classes of persons to control how their personal information is collected, how they are profiled and how information about them is retained and used.

State laws also prohibit computer tampering, which has been construed to include unauthorized storage of tracking information on consumers' computers and implementation of website code that circumvents consumers' computer privacy settings. Such laws would also implicate conduct that diminishes or disables the utility of disabled consumers' accessibility-assistive tools.

Should this matter be litigated, then, in addition to seeking final remedies on behalf of our clients, we would seek the following declaratory judgments:

- A "reasonably prudent user" or "consumer acting reasonably under the circumstances" objectively includes persons with disabilities who use assistive technologies and devices such as those described above, in characterizing our clients.
- Our clients shall not be bound by any term or condition, or deemed to have received any notice, in any purported communication, or "browsewrap" agreement that was not reasonably accessible to that individual before our clients sustained the harms alleged above. *See Van Tassell v. United Mktg. Grp.*, LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (for contract allegedly entered into merely by use of website, validity is contingent on evidence of actual or constructive notice); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30-31 (2d Cir. 2002); *Small Justice LLC, et al. v. Xcentric Ventures LLC*, No. 13-cv-11701 (D. Mass. Mar. 27, 2015); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009) (defining browsewrap agreement as one to which party assents merely by use of website, without affirmatively assenting to terms and conditions).
- Our clients shall not be bound by any term or condition in any purported "clickwrap" agreement to which assent is ambiguous in the context of the website content and assent mechanism in interactions with assistive devices described above. *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).[11]

### III. PROPOSAL FOR RESOLUTION AND REMEDIAL MEASURES

In lieu of formal litigation, we propose that the parties engage in settlement negotiations on an expedited basis, with the goal of achieving an enforceable settlement agreement providing for injunctive relief, and reasonable attorney's fees and costs. We would be willing to pursue these negotiations either directly or with the assistance of a mutually acceptable mediator.

The remedial measures would include, at a minimum, the following:

- Designate one or more individuals to manage web accessibility testing, repairing, implementation, maintenance and reporting for a WCAG 2.0 compliant website within a reasonable time period.
- Create, adopt and maintain a web accessibility policy consistent with prevailing standards.
- Initiate a needs assessment and subsequent training for web and content development personnel on WCAG 2.0 accessibility programming, functionality and design.
- Contractually require that services procured and performed by third-party developers and other relevant service providers conform to prevailing WCAG 2.0 compliant accessibility standards and your web accessibility policy.
- Implement other related policy, technology and programming, monitoring and training measures as they are identified and needed.

Enclosed please find a draft Settlement Agreement for your review and consideration.

**To discuss this matter further, please contact Daniel Hart, at <dhart@carlsonlynch.com>.**

This letter is a confidential settlement communication and cannot be used in any action before any court. The statements of either party in these settlement negotiations cannot be considered admissions nor are they binding upon parties if no settlement is reached.

We hope that you will share our view concerning the value of a collaborative approach in expeditiously resolving these accessibility issues.

We look forward to your quick response.

| | | |
|---|---|---|
| Benjamin J. Sweet | R. Bruce Carlson | Scott Kamber |
| CARLSON LYNCH SWEET & KILPELA LLP | | KAMBERLAW, LLC |
| 1133 Penn Avenue, 5th Floor | | 100 Wall Street, 23rd Floor |
| Pittsburgh, PA 15222 | | New York, NY 10005 |

## ENDNOTES

1 In addition to the members of Access Now, Carlson Lynch Sweet Kilpela & Carpenter, LLP represents blind and other disabled individuals in numerous states, including Michigan, Washington, Texas, Illinois, Oregon, Pennsylvania, Massachusetts, and California, among others. Many federal courts have determined that a plaintiff who acts as a tester satisfies the standing requirements mandated by Article III of the United States Constitution. *See, e.g., Heinzl v. Cracker Barrel Old Country Stores, Inc.*, No. 14-1455, DKT. No. 113, at 40-41 (W.D. Pa. Jan. 27, 2016) ("[T]he weight of authority is to permit standing to a plaintiff who acts as a tester."). Courts have explained that "anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion." *Id.* (citing *Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014). It is "incumbent upon [d]efendant to ensure that its facilities comply with the ADA, regardless of the possible motive (or motives) of individuals who visit them." *Id.* at 41.

2 *See, e.g., Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1334 (11th Cir. 2013) ("Plaintiff['s]...tester motive behind his visits to the Presidente Supermarket does not foreclose standing for his claim under" Title III of the ADA); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1069 (9th Cir. 2009)("[W]e accord standing to individuals who sue defendants that fail to provide access to the disabled in public accommodation as required by the [ADA], even if we suspect that such plaintiffs are hunting for violations just to file lawsuits."); *Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004) (recognizing that "testers" have standing to sue under Title II of the ADA); *Gaylor v. Greenbrier of Dahlonega Shopping Center, Inc.*, 975 F.Supp.2d 1374, 1386 (N.D. Ga. 2013) (noting that there is "well-established authority recognizing that visits to a property as a tester to determine whether it has been made ADA compliant can serve as a legitimate basis for establishing standing"); *Klaus v. Jonestown Bank and Trust Company*, 2013 WL 4079946, at *7 (M.D. Pa. Aug. 13, 2013)("Likewise, we find unpersuasive the defendant's suggestion that because the plaintiff is admittedly a 'tester' of banking accommodations in this

geographic area, and has accordingly initiated numerous actions in federal court to remedy perceived violations of Title III of the ADA affecting the plaintiff and other members of the visually-impaired community, that this somehow undermines his standing to prosecute this particular lawsuit. As the plaintiff emphasizes in his brief, numerous courts have rejected the notion that test plaintiffs, or other serial litigants, forfeit their own standing to sue for discrimination in Title III accessibility cases.") (internal citations omitted); *Access For The Disabled, Inc. v. First Resort, Inc.*, 2012 WL 2917915, at *2-3 (M.D. Fla. July 17, 2012) ("[W]hether [plaintiff] is an ADA 'tester' does not preclude her standing in this case."); *Segal v. Rickey's Restaurant and Lounge, Inc.*, 2012 WL 2393769, at *4-5 (S.D. Fa. June 25, 2012) (denying a defendant's "tester" argument and finding the plaintiff had standing); *Betancourt v. Federated Department Stores*, 732 F.Supp.2d 693, 710 (W.D. Tex. 2010) ("A disabled tester who experiences the discrimination prohibited by the ADA has standing to seek relief"); *Kittok v. Leslie's Poolmart, Inc.*, 687 F.Supp.2d 953, 958-59 (C.D. Cal. 2009) ("The persistence of plaintiffs in bringing multiple lawsuits alleging unequal access to places of public accommodation does not demonstrate wrongdoing by plaintiffs anymore than it shows a hesitation of businesses to comply with the law. As the Ninth Circuit has noted in the context of ADA litigation, 'for the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA.'"); *Access 4 All, Inc. v. Absecon Hospitality Corp.*, 2006 WL 3109966, at *7 (D.N.J. Oct. 30, 2006) ("Indeed, because Plaintiff Esposito is a frequent litigant with the stated goal of ensuring ADA compliance, his claim of intent to return to the Hampton Inn to do additional examinations is made more, not less, credible."). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75 (1982) (Supreme Court recognized the standing of a "tester" in the context of the Fair Housing Act).

[3] *See, e.g., New v. Lucky Brand Dungarees Stores, Inc.*, Statement of Interest of the United States, Case No. 14-CV-20574 (S.D. Fla.) ("The Department has long considered websites to be covered by Title III despite the fact that there are no specific technical requirements for websites currently in the regulations or ADA standards."); Statement of Interest of the United States, *Nat'l Assoc. of the Deaf v. Netflix Inc.*, 869 F. Supp. 2d 196 (D. Mass 2012), available at http://www.ada.gov/briefs/netflix_SOI.pdf (discussing history of public DOJ pronouncements on the topic); Consent Decree, *Nat'l Fed of the Blind, et al., United States of America v. HRB Digital LLC and HRB Tax Group, Inc.*, No. 1:13-cv-10799-GAO (entered March 25, 2014), available at http://www.ada.gov/hrb-cd.htm (comprehensive decree governing accessibility of H&R Block's website).

[4] Specifically, the DOJ expressed "[t]he ADA's promise to provide an equal opportunity for the individuals with disabilities to participate in and benefit from all aspects of American civic and economic life will be achieved in today's technologically advanced society only if it is clear to State and local governments, businesses, educators, and other public accommodations that **their websites must be accessible**." *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, available at http://www.ada.gov/anprm2010/web%20anprm_2010.htm (emphasis added).

[5] On June 5, 2014 the DOJ announced it had settled website accessibility claims with Florida State University. *See* Justice Department Reaches Settlement with Florida State University, available at http://www.justice.gov/opa/pr/2014/June/14-crt-606.html. Under the settlement, FSU agreed to make its website and mobile applications conform to the WCAG 2.0 AA Guidelines, at a minimum.

[6] 42 U.S.C. § 12812(a).

[7] *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodation, available at http://www.ada.gov/anprm2010/web%20anprm_2010.htm.

[8] 42 U.S.C. § 12182(b)(1)(A)(i)-(ii).

[9] 28 C.F.R. § 36.303(c); *see also* 42 U.S.C. 12182(b)(2)(A)(iii) ("[D]iscrimination includes…a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently that other individuals because of the absence of auxiliary aids and services.").

[10] 28 C.F.R § 36.303(b)(2).

[11] In light of these concerns, this letter confirms your obligation to locate and preserve any and all documents, data, and tangible things potentially relevant to the matters raised in this letter and your potential defenses, whether in your possession or the possession of third parties and subject to your control, and including but not limited to: computer code, instructions, and documentation; documents relating to third-party developers, affiliates, and data partners; and records of consumer consent to data collection, use, and retention; and including metadata associated with documents.

Your obligation extends to personal information from and about our clients; documents relating to third-party recipients and providers of such information, including agreements and correspondence relating to your relationships with those third parties; and server and application log files created in the course of transactions in which such information was collected from our clients or transmitted to or from third parties.

We also note that your obligation to locate and preserve documents extends to documents relating to actual or attempted detection or determination of identities, disability statuses, or use of accessibility technology and devices of visitors to your website, and including where such efforts involved device or browser fingerprinting in website interactions with consumers; other website code; analytics; or information obtained from or provided to third parties.

# CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into between PLAINTIFF ("PLAINTIFF") and DEFENDANT ("DEFENDANT") and its subsidiaries, divisions, affiliates, successors and assigns ("DEFENDANT").

WHEREAS, DEFENDANT owns and operates the following websites: COMPANY WEBSITE (collectively "WEBSITE") on behalf of DEFENDANT, which is available through the Internet to personal computers, laptops, smart phones, tablets, and other similar devices. Through its WEBSITE DEFENDANT offers products for online sale and home delivery. DEFENDANT'S WEBSITE also helps users locate DEFENDANT'S retail stores, provide product and pricing information, and perform a variety of other functions that can be useful to consumers;

WHEREAS, PLAINTIFF alleges that following a compliance review by counsel for PLAINTIFF and experts retained on PLAINTIFF'S behalf, the WEBSITE are not fully accessible to individuals with disabilities in violation of Title III of the ADA;

AND WHEREAS, DEFENDANT disputes the allegations set forth above and denies that its WEBSITE are in violation of Title III of the ADA. NOW THEREFORE, in consideration of the mutual promises contained therein, and intending to be legally bound, the PARTIES AGREE, as follows:

1. <u>Release of PLAINTIFF's Claims</u>. For and in consideration of the promises, commitments and undertakings set forth in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, PLAINTIFF, on behalf of himself

84159773.2

and any of his agents, employees, representatives, assigns, heirs, executors, trustees, partners and attorneys, and each of them (the "Releasing Persons"), shall be deemed to have jointly and severally forever released and discharged DEFENDANT, together with its past, present, and future officers, directors, employees, agents, stockholders, attorneys, servants, representatives, parent entities, subsidiary entities, affiliate entities, partners, insurers, and to the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing, (collectively, the "Released Parties"), from any and all claims, causes of action, suits, demands, rights, liabilities, damages, lawsuits, losses, fees, costs or expenses of any kind whatsoever, whether known or unknown, including any monetary, injunctive or declaratory relief relating thereto, or for reimbursement of attorney's fees, costs and expenses, relating to the Action, but not including claims related to the enforcement of this Agreement. This release expressly applies to all claims regarding the accessibility of the WEBSITE, including but not limited to all claims arising from or relating to the ADA, any federal, state, or local law, statute or ordinance, rule or principle of common law or doctrine in law or equity, known or unknown, suspected or unsuspected, foreseen or unforeseen, real or imaginary, actual or potential, through the date of this Agreement (the "Released Claims"). PLAINTIFF, on his own behalf and on behalf of the Releasing Persons, acknowledges that he may have released claims that are presently unknown and that the release contained in this Agreement is intended to and does fully, finally and forever discharge all such released claims, whether now asserted or unasserted, known or unknown, he may have against DEFENDANT.

2. <u>Payment of Certain Attorney's Fees and Expenses</u>. DEFENDANT has agreed to pay certain attorneys' fees and expenses in the amount and in accordance with the terms memorialized in a separate, confidential letter agreement dated DATE. .

3. <u>Carlson Lynch Sweet & Kilpela LLP's Obligation To Assist Defendant</u>. During the term of this Agreement as set forth below in Paragraph 21 and for two (2) years thereafter, if Defendant receives any inquiries or letters, threatened lawsuits or threatened investigations, or actual lawsuits or investigations from any parties (including, without limitation, individuals, numerous individuals, purported classes, other counsel, advocacy groups, and/or government regulators) relating to the alleged inaccessibility of the Website ("Additional Potential Website Claims"), Carlson Lynch Sweet & Kilpela LLP ("Carlson Lynch") shall, at its reasonable expense (*i.e.,* not to include airfare or overnight travel), be obligated to use best efforts, at Defendant' written request, to assist and cooperate in the prevention of the Additional Potential Website Claims from being brought against Defendant, or to assist in extinguishing and/or achieving the dismissal, removal, or rescission of such Additional Potential Website Claims that may be brought against Defendant. These efforts shall include: contacting the Parties involved in the Additional Potential Website Claims (e.g., regarding: terms of the Agreement Defendant approves for disclosure; Defendant's commitment to making the Website accessible; and Carlson Lynch's reputation and experience with website accessibility matters); assisting in the preparation of necessary documentation (including, but not limited to, court or regulatory filings) and/or providing other reasonable or necessary assistance to Defendant should it need to explain this Agreement and its terms to another party, regulator, or Court. The Parties agree that this obligation on Carlson Lynch is a material term of this Agreement and a primary consideration for Defendant entering into the Agreement. Nothing in this provision shall be construed as a commitment that Defendant retain Carlson Lynch's legal services; to the contrary, Carlson Lynch undertakes this obligation of its own volition and at its own expense in the event that a third party engages in a duplicative effort to achieve relief already obtained by Claimant herein.

4. <u>Remedial Measures</u>. DEFENDANT shall improve the accessibility of the U.S. portion of its website to blind and visually impaired users. DEFENDANT shall use WCAG 2.0 Level AA as a guideline in making such improvements and shall cause its website to satisfy the WCAG 2.0 Level AA standards to the greatest extent reasonably possible.

**Website Privacy and Legal Notice Considerations:**

5. As to the Website privacy policy ("Privacy Policy") and Website terms and conditions ("Terms of Use"), DEFENDANT shall provide reasonable means for individuals with disabilities to:

   a. Determine and navigate to the locations of Privacy Policy and Terms of Use; and

   b. Access the substantive content of the Privacy Policy and Terms of Use.

6. Company shall implement a reasonable processes for notifying Disabled Users of any material changes to the Privacy Policy, which shall, at a minimum, require DEFENDANT to conspicuously post a notice on the Website home page that the Privacy Policy has changed, and to do so in a manner consistent with applicable law.

## MISCELLANEOUS PROVISIONS

7. <u>Enforcement</u>. If PLAINTIFF believes that this Agreement or any portion of it has been violated, PLAINTIFF shall give notice (including reasonable particulars) of such violation to DEFENDANT. DEFENDANT must respond to such notice as soon as practicable but no later than thirty (30) calendar days thereafter. PLAINTIFF and DEFENDANT shall negotiate in good faith in an attempt to resolve any dispute relating thereto and will, if necessary, submit all

disputes to a mutually agreeable mediator. If the parties are unable to reach a mutually acceptable resolution, PLAINTIFF may seek court enforcement of compliance with this Agreement.

8. DOJ. If the United States Department of Justice promulgates a final ADA Title III regulation setting out a website accessibility technical standard applicable to DEFENDANT'S WEBSITE during the term of this Agreement, DEFENDANT will take reasonable and necessary efforts to ensure legal compliance with such standards within the time frames set forth in the regulations.

9. Scope. This Agreement does not purport to remedy any violations or potential violations of the ADA or any federal or state law, other than those regulating to the accessibility of the WEBSITE to individuals with disabilities.

10. Authority. The signatories represent that they have the authority to bind the respective parties identified below to the terms of this Agreement.

11. Confidentiality. PLAINTIFF, for himself and his Counsel, agents and representatives, and DEFENDANT, its Counsel, agents and representatives, agree that, they will not without the prior written consent of the other Party communicate, publish, display, discuss, disclose, reveal or characterize (directly or indirectly by innuendo or other means) in any way to anyone under any circumstances (i) the terms of this Agreement, (ii) the negotiations leading up to this Agreement, and (iii) the circumstances concerning any dispute related to the Action, except (a) as may be required by Order of Court or other quasi-judicial or regulatory body with the legal right and power to demand such information, (b) to PLAINTIFF'S or DEFENDANT'S legal and financial advisors, in each case where such disclosure may be required for legitimate

legal, business or tax purposes and where the recipient of such information agrees to receive and maintain the information in strict confidence in accordance with the terms of this Agreement, (c) to any appropriate regulatory or tax authorities with jurisdiction over PLAINTIFF or DEFENDANT, and (d) as otherwise may be required by law. Prohibited disclosure hereunder shall include, without limitation, the making of any statement, written or oral, to any person through any medium, including (without limitation) newspaper, magazine, radio, television or electronic media (such as internet website, chat room, instant messaging or any other similar medium). If PLAINTIFF or DEFENDANT, or their respective Counsel, agents or representatives receive an unsolicited inquiry about this Agreement, the Action, any disputed matter, any released claims, or any other matter subject to the confidentiality and non-disclosure provisions of this Agreement, such Party will respond only that "the matter has been amicably resolved." Further, PLAINTIFF and DEFENDANT and their respective Counsel, agents and representatives, agree not to make any disparaging remarks about the other Party relating to (i) this Agreement, or (ii) the services or practices of DEFENDANT related to the subject matter of this Agreement. If any Party shall be in material breach of the obligations in respect of the confidentiality and non-disclosure provisions of this Agreement, the non-breaching Party shall be entitled to, in addition to other remedies, temporary and permanent injunctions restraining such breach, and to a decree for specific performance of this provision. The Parties further agree that non-breaching Party shall be entitled to recover from the breaching Party its attorneys' fees and costs expended in any action or proceeding to enforce this Paragraph of this Settlement Agreement.

12. <u>Counterparts Permissible</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original against the Party whose signature is provided, and all of

which shall be considered an original and together shall constitute one agreement binding on all Parties. Electronic signatures shall be deemed to be as valid and enforceable as original ink signatures.

13. <u>Notices</u>. All letters, notices, requests, demands and other communication required or permitted to be given to the Parties pursuant to this Agreement shall be in writing, provided by electronic mail, facsimile and/or next-day (excluding Saturday and Sunday) express delivery service and addressed as follows:

    For PLAINTIFF:                         R. Bruce Carlson, Esq.
                                                      Benjamin J. Sweet, Esq.
                                                      Carlson Lynch Sweet & Kilpela LLP 1133 Penn Avenue
                                                      5th Floor
                                                      Pittsburgh, PA 15222
                                                      Email: bcarlson@carlsonlynch.com
                                                      Email: bsweet@carlsonlynch.com
                                                      Phone: 412-322-9243
                                                      Fax: 412-231-0246

    For DEFENDANT:

14. <u>Governing Law</u>. This Agreement shall be executed and delivered in the Commonwealth of Pennsylvania. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to conflicts or choice of law rules or principles,. Any action to enforce the terms of this Agreement shall be filed in the Commonwealth of Pennsylvania only.

15. <u>Waiver</u>. If a party, by its actions or omissions, waives or is adjudged to have waived any breach of this Agreement, any such waiver shall not operate as a waiver of any other subsequent breach of this Agreement.

16. <u>Successor and Assigns</u>. This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal or legal representatives, successors and/or assigns.

17. <u>Construction of Agreement</u>. The parties waive all applicable rules of construction to the extent that any provision of this Agreement should or could be construed against its drafter. The parties further agree that all provisions of this Agreement shall be construed as a whole, according to the fair meaning of the language used.

18. <u>Severability</u>. If any provision of this Agreement is or shall be declared invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall not be affected thereby and shall remain in full force and effect.

19. <u>Integration and Modification</u>. This Agreement contains all of the representations, promises, and understandings of the parties. There are no other agreements or understandings except as set forth therein.

20. <u>Duration</u>. This Agreement will be effective for twenty-four (24) months from execution, at which point it will expire.

Intending to be legally bound, the parties have executed this Agreement.

DEFENDANT

_____          _____
Plaintiff

_____          _____
R. Bruce Carlson, Esq.
Benjamin J. Sweet, Esq.
Carlson Lynch Sweet

Kilpela & Carpenter LLP
Attorneys for PLAINTIFF
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Email: bcarlson@carlsonlynch.com
Email: bsweet@carlsonlynch.com
Phone: 412-322-9243
Fax: 412-231-0246

DATED: