**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMSHIRE**

| | | |
|---|---|---|
| ACCESS NOW, INC., | ) | |
| a not-for-profit corporation; | ) | |
| R. DAVID NEW; JOHN MULE; | ) | |
| STEPHEN YERARDI; and | ) | |
| STEPHEN THEBERGE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No: 1:17-cv-00116-JL |
| v. | ) | |
| | ) | |
| BLUE APRON, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF AMICUS CURIAE NATIONAL FEDERATION**
**OF THE BLIND[1] IN SUPPORT OF PLAINTIFFS**

Title III of the Americans with Disabilities Act ("ADA" or "Title III"), 42 U.S.C. §§ 12181-12189, and its implementing regulations require public accommodations to provide individuals with disabilities an equal opportunity to use and enjoy their programs and services, including their web-based programs and services. In addition, Title III requires public accommodations to ensure all their communications are equally effective for persons with and without disabilities. While there is no doubt that Congress intended that the ADA's broad mandate apply to new technologies, such as websites, Defendant asks this Court to deny all blind persons access

---

[1] The National Federation of the Blind ("NFB) is a non-profit corporation headquartered in Baltimore, Maryland. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. NFB and its affiliates are recognized by the public, Congress, executive agencies of state and federal governments, and courts as a collective and representative voice on behalf of blind Americans and their families. The ultimate purpose of NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social discrimination. As part of its mission and to achieve these goals, NFB has worked actively to ensure that the blind have an equal opportunity to access the internet and other emerging technology. *Amicus* certifies that no party's counsel authored the brief in whole or in part, no party or party's counsel contributed money intended to fund preparation or submission of this brief, and no person other than *amicus* and its counsel contributed money intended to fund preparation or submission of the brief.

to its website simply because it lacks a physical location.  To do so would promote barriers that deny individuals with disabilities the chance to participate equally in society, undermining both the history of the ADA and decades of precedent in this Circuit.

Defendant also asserts that people with disabilities cannot enforce their rights until the Department of Justice ("DOJ") issues new regulations providing web-specific technical standards, even though the ultimate obligation to provide equal access would be left unchanged. Twenty-seven years after the ADA, neither the Due Process clause nor the primary jurisdiction doctrine requires individuals with disabilities to wait indefinitely to enforce their rights.  This Court should confirm that people with disabilities are entitled to access covered websites equally and to enforce their right to do so immediately, not at some speculative future date.

As the oldest and largest national organization of blind persons, NFB has a unique interest in and understanding of the legal, social, and economic implications of the inaccessibility of websites to blind Americans, as well as of the larger legal framework, history and development of the ADA, and the state of accessible and assistive technology and accessibility standards that inform the application of the law

## INTRODUCTION

The Internet has become a fundamental part of the daily experiences of the vast majority of Americans. The wide-scale adoption of this technology is staggering. According to statistics compiled by the International Telecommunication Union, the proportion of the United States public using the Internet went from 14% in 1995, to 87% in 2014[2] – amounting to more than 277

---

[2] Pew Research Center, The Web at 25 in the U.S., at 4-5 (Feb. 27, 2014), *available at*: http://www.pewinternet.org/2014/02/27/the-web-at-25-in-the-u-s/ (last visited August 23, 2017).

million people in the United States who were using the Internet.[3] The growth of Internet usage is rivaled only by the myriad ways in which users can harness the capabilities of the Internet for the betterment of their lives through education, employment, commerce, entertainment, and countless other pursuits.

As the NFB and other disability rights organizations explained to DOJ:

In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.

[T]he lack of accessibility to Web content relating to education and employment have far reaching effects on every other aspect of the lives of individuals with disabilities. Barriers to educational and employment opportunities online (of which there are many) stymie or altogether prohibit individuals with disabilities from gaining the earning power necessary to obtain all of the other benefits available to a truly independent American. Congress described this very issue in crafting its findings in support of the ADA: "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

---

[3] U.S. Census Bureau, Projections of the Size and Composition of the U.S. Population: 2014 to 2060, at 2 (U.S. population in 2014 was 318.7 million) https://www.census.gov/content/dam/Census/library/publications/2015/demo/p25-1143.pdf (last visited August 23, 2017).

Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," CRT Docket No. 128, RIN 1190-AA65 (hereinafter "Disability Rights SANPRM Comment"), https://nfb.org/ada-title-ii-internet-regulations-joint-sanprm-comments, Answer 57 (October 7, 2016)(citations omitted). If a covered entity's web content is inaccessible, individuals with disabilities face increased time and effort, delay in access, reliance on third parties, and even outright denial of access. When encountering an inaccessible website:

> most individuals with disabilities will endeavor to access material on their own even if it requires an unreasonably greater amount of time or effort than required for nondisabled persons. Many individuals with disabilities will also seek assistance, either from an employee of a covered entity or a third party. It is not uncommon for the covered entity to refer the person back to the website or state that it is not his or her responsibility to help with the inaccessible request for information. In addition, a blind person would not wish to entrust a stranger, which may be the only option for some, with personal or financial information to submit a request or payment online when it is convenient for them.

*Id.*, at Answer 67. Calling or traveling to an office is often not a possibility either because of transportation, communication, and other barriers, or because it is not convenient to do so, or because the entity will not accept in-person visits.

> These options are more time-consuming and costly and are not acceptable while other, nondisabled persons are enjoying the convenience of easily accessing Web content. Unfortunately, in too many cases, the inaccessibility of the Web content either compels the individual with a disability to abandon their effort or it chills others entirely from attempting to access the subject service, program, or activity.

*Id.*

Inaccessible websites interfere with the ability of people with disabilities to obtain and maintain employment and education. Employment has remained elusive for individuals with

4

disabilities, who are less than half as likely to be employed (35.2%) as their nondisabled peers (78.3%)[4] and who, when employed, are far more likely to be self-employed and limited to part-time work (22% of people with disabilities working full time compared to 58.6% of people without disabilities).[5] Access barriers to online materials have also been shown to cause a discrepancy in graduation rates between students with (33%) and without disabilities (48%).[6] The quality of an education is also adversely affected by inaccessible Web content. While a student with a disability may be exempted from course requirements involving inaccessible Web content, they are then deprived of information relevant to their courses and their professions.

## ARGUMENT

### I. Websites are public accommodations subject to Title III of the ADA.

Title III prohibits discrimination by public accommodations. 42 U.S.C. § 12182. The statute defines "public accommodations" in twelve broad categories based on the type of business activity the entity conducts. 42 U.S.C. § 12181(7). Although Blue Apron, a meal-kit delivery service, is a "sales or rental establishment," *see* 42 U.S.C. 12181(7)(E), Defendant asks this Court to hold that it cannot be a public accommodation under Title III because it lacks a "nexus with an actual, physical location." Def.'s Mem. in Supp. of its Rule 12(b)(6) Mot. to Dismiss at 5, ECF No. 21-1 ("Def.'s Mem."). Contrary to Blue Apron's contention, the legisla-

---

[4] 2015 Disability Status Report, http://www.disabilitystatistics.org/StatusReports/2015-PDF/2015-StatusReport_US.pdf?CFID=847544&CFTOKEN=58cfabab4556b034-AECF064E-CE27-D09C-2AB4F490D8ACB682, at 31 (last visited August 23, 2017).

[5] *Id.* at 34.

[6] Clinton Smith et al., Nat'l Soc. Sci. Ass'n, *The Missing Piece: The Need for Training Online Faculty to Design Accessible Online Courses*, http://www.nssa.us/tech_journal/volume_4-1/vol_4-1_article4.htm.

tive history, case law, and DOJ's interpretation of the ADA all confirm that the nature of the services that Blue Apron provides make it a place of public accommodation under Title III.

    **A.** <u>Legislative history establishes Congress's intent that Title III apply to websites</u>.

    The dispositive factor in construing a statute is Congress's intent. *United States v. Alpers*, 338 U.S. 680, 682 (1950) (the rule of *ejusdem generis* cannot be employed to "obscure and defeat the intent and purpose of Congress").  The legislative history of the definition of "public accommodation" shows that Congress wanted the list of 12 exemplars in the definition to be "construed liberally."  S. Rep. No. 101-116, 59 (1990) ("[W]ithin each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities.  The Committee intends that the 'other similar' terminology should be construed liberally. . . ."); *see also* H.R. Rep. 101-485 (III) at 54, *reprinted in* 1990 U.S.C.C.A.N. at 477 (same).  The law's breadth is evident in Congress's agreement with the Attorney General that the definition "must bring Americans with disabilities into the mainstream of society 'in other words, full participation in and access to all aspects of society.'"  H.R. Rep. 101-485 (II) at 36, *reprinted in* 1990 U.S.C.C.A.N. at 317 (internal citation omitted).  Congress intended the ADA's broad access mandate to apply to emerging technologies like those offered by Blue Apron. "[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities . . . should keep pace with the rapidly changing technology of the times."  *Id.* at 108, *reprinted in* 1990 U.S.C.C.A.N. at 391 (cited in *Netflix*, 869 F. Supp. 2d at 200-01).[7]

---

[7] Over a decade before enactment of the ADA, the Supreme Court noted in applying the Rehabilitation Act of 1973 that "[i]t is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped

B.     First Circuit precedent confirms that websites are places of public accomodation.

Twenty-three years ago, the First Circuit held in *Carparts Distribution Center v. Auto Wholesaler's Ass'n of New England* that public accommodations are not limited to actual physical structures. 37 F.3d 12 (1st Cir. 1994).  The court concluded that "Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure…one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services." *Id.*  *Carparts* has since been affirmed and applied by courts within the District to require covered public accommodations to make their websites accessible even if they lack nexuses to physical locations. *See Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F.Supp.2d 196, 200 (D. Mass. 2012).  In *Netflix*, the District of Massachusetts found that Title III applies to entities that provide exclusively web-based services to the public, regardless of whether they have a connection to a physical structure. *Id.*  Quoting *Carparts*, the *Netflix* court stated that "[i]n a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.'" *Id.* (quoting 37 F.3d at 20).

C.   DOJ has consistently stated that public accommodations offering goods and services without a physical location, including websites, are covered by Title III.

---

persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities . . . ." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 (1979).

DOJ has consistently told courts, members of Congress, and businesses that Title III applies to web-based businesses. In 1996, Senator Tom Harkin, the chief Senate sponsor of the ADA, asked DOJ whether the ADA applies to websites. DOJ confirmed that "Covered entities under the ADA are required to provide effective communication, regardless of whether they generally communicate through print media, audio media, or computerized media such as the Internet." Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996).[8] That has been DOJ's position for twenty-one years. In 2010, Samuel R. Bagenstos, the Principal Deputy Assistant Attorney General for Civil Rights, testified that "a business providing services *solely over the internet* is subject to the ADA's prohibitions on discrimination on the basis of disability." *Emerging Technologies and the Rights of Individuals with Disabilities: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. 5, 6 (emphasis added). *See also Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites: Hearing before the House Subcommittee on the Constitution of the House Committee on the Judiciary,* 106th Cong., 2d Sess. 65–010 (2000) ("It is the opinion of the Department of Justice currently that the accessibility requirements of the Americans with Disabilities Act already apply to private Internet Web sites and services."); *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations* ("*ANPRM*"), 75 Fed. Reg. 43,460-01 (July 26, 2010) ("The Department believes that title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations.")). Furthermore, DOJ has initiated

---

[8] *Available at* http://www.justice.gov/crt/foia/readingroom/frequent_requests/ada_tal/tal712.txt.

litigation and filed briefs to enforce Title III requirements for websites that offer the services of a public accommodation, including in *Netflix,* where it said "a web-based service . . . should be considered a public accommodation just like a travel service that has no physical structure for customers to enter, but conducts business by telephone."[9] DOJ's ADA enforcement also includes settlements with web-based businesses, such as Peapod online grocery delivery service.[10]

An amicus brief recently filed in the Supreme Court by DOJ confirms DOJ's position. Brief for the United States as *Amicus Curiae*, *Magee v. Coca Cola Refreshments USA, Inc.*, No 16-668 (2017). DOJ argued that vending machines are not places of public accommodation because they lack the characteristics of other "sales or rental establishments" listed in the statute, which "are all retail businesses that (1) sell goods to the public; (2) have a discrete, standalone location or identity; and (3) are typically operated by an on-site proprietor or employees." *Id.* at 9. Unlike vending machines, websites like Defendant's possess all three characteristics: Blue

---

[9] Statement of Interest of the United States in Opp'n to Def.'s Mot. for Judgment on the Pleadings at 7, *Netflix*; *see also e.g.*, *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 574-575 (D. Vt. 2015) (explaining that "DOJ has taken the position that the ADA applies to the Internet and web-based goods and service providers"); Brief of the United States as Amicus Curiae in Support of Appellant at 7, *Hooks v. OKbridge, Inc.*, No. 99-50891, 1999 WL 33806215 (5th Cir. Aug. 1, 2000) (arguing that a company operating bridge tournaments exclusively on the Internet is covered by Title III); Brief of the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Prods., Ltd.*, No. 01-11197, 1999 WL 33806215 (11th Cir. May 3, 2001) (arguing against notion that Title III applies only when there is a nexus between entity's challenged activity and its brick-and-mortar facility); Mot. of United States to Intervene as Pls., *Nat'l Fed'n of the Blind v. HRB Digital LLC*, Civil Action No. 1:13-cv-10799-GAO (intervening to challenge the legality of H&R Block's inaccessible website and mobile apps).

[10] *E.g.*, Settlement Agreement Between the United States and Ahold U.S.A., Inc. and Peapod, LLC, http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/11/17/peapod_settlement_agreement.pdf (requiring online grocery delivery service to provide an accessible website); *see infra* note 11 (over 25 settlement agreements involving website accessibility to which the United States has been a party).

Apron sells groceries to the public, has a discrete business identity, and is operated by employ-

ees, including customer service staff, online chat staff, and staff who fill and deliver orders.

Moreover, the DOJ brief explains that an entity can still be a sales or rental establishment

under the ADA even if it does not possess all three characteristics:

> The term 'sales or rental establishment' likewise is not categorically limited to
> businesses that are staffed by human proprietors or employees. Congress's inclu-
> sion of a catch-all provision serves in part to facilitate the ADA's application to
> new businesses that utilize technologies or methods of operation that were un-
> known when the statute was enacted in 1990. In particular, businesses may
> develop sophisticated automation capable of performing complex transactions that
> closely resemble -- or fully replace – the traditional establishments listed in Title
> III…. [Thus], a store could qualify as an ADA 'sales establishment' even though
> automated devices perform functions that human employees would have per-
> formed when the ADA was enacted.

*Id*. at 10-11. Blue Apron is precisely such a sales establishment.

**II. Requiring ADA compliance does not violate covered entities' due process rights.**

Defendant argues that ordering compliance with the ADA would violate due process

because DOJ has not issued regulations setting a technical standard for conformance. Def.'s

Mem. at 15. Undisputedly, covered entities have "a due process right to fair notice of regulators'

requirements." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768–70 (9th Cir. 2008)). Yet

Defendant here, as well as other covered entities, had fair notice for three reasons.

> A. Covered entities have sufficient notice of their obligation to make their websites
>    <u>accessible to individuals with disabilities.</u>

Defendant and other covered entities have had adequate notice of their obligation to offer

people with disabilities an equal opportunity to access and enjoy their websites. First, the

ADA's text makes clear that covered entities must afford individuals with disabilities "full and

equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommoda-

tions."  42 U.S.C. § 12182(a); *see* 28 C.F.R. § 36.201(a) (same).  *Carparts* and *Netflix* establish that Defendant's meal delivery service is such a covered public accommodation.

Second, DOJ's Title III regulations make clear that this statutory mandate requires covered entities to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  Such aids and services specifically include "accessible electronic and information technology."  28 C.F.R. § 36.303(b)(2), (c)(1). Thus, the statutory text and existing regulations already placed Defendant on notice that it needed to provide people with disabilities equal access to its website, both so they may fully and equally enjoy Defendant's goods and services and to ensure effective communication.

Nothing in the statue or regulations of Title III exempts websites or any other method of communication from meeting the equally effective communication standard.  Moreover, since 1996, DOJ has consistently reaffirmed that the ADA's mandate of equal access applies to websites.  *See* discussion *supra* section I.C.  An agency's interpretation of its own regulations is entitled to deference.  *Auer v. Robbins,* 519 U.S. 452, 461 (1997).  Courts must give "controlling weight" to DOJ's interpretation of its ADA implementing regulations "unless it is plainly erroneous or inconsistent with the regulation.'"  *City of Pittsfield, Mass. v. U.S. E.P.A.*, 614 F.3d 7, 11 (1st Cir. 2010) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). DOJ's consistent interpretation that the ADA requires full and equal access to covered entities' websites comports with the statute and regulations and is entitled to deference.

The current status of the legal requirements for accessibility of websites is similar to the status of closed captioning at movie theaters prior to the DOJ Final Rule issued on that subject in 2016.  As DOJ explained in the preamble to that Final Rule, "Neither closed movie captioning

nor audio description existed when the ADA was enacted. Both, however, fall within the type of auxiliary aid contemplated by the statute. Given the current availability of digital movies with closed movie captioning and audio description, as well as the individual devices to provide those accessibility features to movie patrons [with disabilities], the Department believes that a rule requiring movie theaters to offer closed movie captioning and audio description for digital movies fits comfortably within the meaning of the ADA's mandate."  Nondiscrimination on the Basis of Disability by Public Accommodations—Movie Theaters; Movie Captioning and Audio Description, 81 Fed. Reg. 87348 at 87355 (Dec. 2, 2016).  The statute's failure to specifically require closed captioning, and the absence of regulations specifying exactly how many closed captioning devices must be provided did not prevent courts from requiring movie theaters to offer closed captioning, even before the issuance of the DOJ regulation.  *See Arizona ex rel. Goddard v. Harkins Amusement Enters*., Inc., 603 F.3d 666 (9th Cir. 2010). In *Harkins*, the Ninth Circuit evaluated the statute's language, regulations, and case law, and reasoned that because a public accommodation has a duty to provide auxiliary aids and services, including closed captioning and audio description, a movie theater unlawfully discriminates when it fails to offer closed captioning and audio description to persons who have difficulty hearing or seeing, absent proof that those features would fundamentally alter the nature of the theater's services or constitute an undue burden. *Id*. at 675.  *See also Ball v. AMC Entertainment, Inc*., 246 F.Supp.2d 17 (D.D.C. 2003) (rejecting summary judgment on ADA claim for captioning in movie theaters).

The Eastern District of New York denied a defendant's nearly identical motion to dismiss on due process grounds only weeks ago.  *See Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 3278898 (E.D.N.Y. Aug. 1, 2017).  Like Blue Apron, Defendant Blick Art Mate-

rials also argued that compliance with the WCAG guidelines violated principles of due process because the guidelines are "a set of vague recommendations published by a nonprofit entity" and "subject to change at any time."  Mem. of Law in Supp. of Def.'s Mot. to Dismiss, *Andrews*, 2017 WL 3278898, ECF No. 11.  The court rejected the arguments in their entirety, finding that the ADA does not consist of "simple checklists of clear-cut rules," but rather, "standards that are meant to be applied contextually and flexibly.  The uncertainty the defendant complains of is a feature of the Act." *Andrews*, 2017 WL 3278898, at *17.

DOJ's Advance Notice of Proposed Rulemaking ("ANPRM"), which announced, over seven years ago, that DOJ was considering issuing technical guidance on website access, does not render the existing legal obligations a due process violation.  *See ANPRM*, 75 Fed. Reg. 43,460-01.  As the ANPRM explained, DOJ sought to provide technical standards to help provide people with disabilities "consistent access" to websites and to offer covered entities "clear guidance on what is required under the ADA." *ANPRM*, 75 Fed. Reg. at 43,464.  Thus, the purpose was not to create a new legal requirement, but to increase compliance with an existing mandate.  *See Nat'l Ass'n of the Deaf v. Harvard Univ.*, No. 3:15-CV-30023-MGM, 2016 WL 3561622, at *18 (D. Mass. Feb. 9, 2016), *report and recommendation adopted*, No. CV 15-30023-MGM, 2016 WL 6540446 (D. Mass. Nov. 3, 2016) ("impetus for the ANPRM was not because DOJ viewed the ADA as not already mandating website accessibility for the disabled," but because "'the system of voluntary compliance has proved inadequate in providing Web site accessibility to individuals with disabilities'") (quoting *ANPRM*, 75 Fed. Reg. at 43,463-64).

    B.   Requiring Defendant to conform its website to WCAG 2.0 level AA would not violate its due process rights.

Defendant incorrectly argues that this case is about requiring compliance with WCAG 2.0, as opposed to compliance with the ADA's equally effective communication requirement. Def.'s Mem. at 10. Although Plaintiffs referred to WCAG 2.0 in their complaint, explaining that compliance would provide Plaintiffs with equal access to Defendant's website, Compl. ¶ 7, ECF. No. 15-1 ("Compl."), these allegations appear in the section of the complaint entitled "Introduction." In the sections of the complaint stating the causes of action and prayer for relief, Plaintiffs do not refer to WCAG. Instead, Plaintiffs allege that Defendant has violated the ADA by denying them "full and equal access to" the website, Compl. ¶¶ 53, and seeks injunctive relief requiring Defendant "to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals," Compl., Prayer, ¶ 2.

Although Plaintiffs made clear their belief that compliance with WCAG 2.0 would ensure equal access, they did not allege that Defendant's failure to comply with WCAG 2.0 was itself a violation of the ADA or that the only possible relief was ordering compliance with WCAG 2.0. Thus, this case is not an attempt to impose a new legal requirement on covered entities; instead, Plaintiffs seek to enforce the ADA's established promise of full and equal enjoyment of a covered entity's goods and services. If this Court finds that Defendant can fulfill its obligation through some means other than by complying with WCAG 2.0, it may order Defendant to do so. Nonetheless, ordering Defendant to meet this standard as a means of ensuring equal access to its website would not run afoul of due process. WCAG 2.0 is a stable, referenceable, international technical standard for web content accessibility. W3C Web Accessibility Initiative, *Web Content Accessibility Guidelines (WCAG) Overview*, https://www.w3.org/WAI/intro/wcag (last visited

14

July 27, 2017). In explaining why it incorporated WCAG 2.0 in the updated Section 508 accessibility standards, the United States Access Board noted that WCAG 2.0 is a "globally recognized, technology-neutral standard for web content" and a "substantial amount of WCAG 2.0 support material is available, and WCAG 2.0-compliant accessibility features are already built into many products." United States Access Board, *About the Update of the Section 508 Standards and Section 255 Guidelines for Information and Communication Technology*, https://www.access-board.gov/guidelines-and-standards/communications-and-it/about-the-ict-refresh/overview-of-the-final-rule (last visited July 27, 2017). Furthermore, "use of WCAG 2.0 promotes international harmonization as it is referenced by, or the basis for, standards issued by the European Commission, Canada, Australia, New Zealand, Japan, Germany, and France." *Id.*

In more than 25 settlement agreements, DOJ has required covered entities to adhere to WCAG 2.0 level AA to ensure compliance with the ADA.[11] These agreements are all posted on

---

[11] Title II cases: *Settlement Agreement Between United States and Palm Beach County Supervisor of Elections*, DJ Nos. 204-18-218 & 166-18-43 (Jan. 12, 2017), https://www.ada.gov/palm_beach_sa.html; Consent Decree, *Dudley v. Miami Univ.*, No. 1:14-cv-38 (Dec. 14, 2016), https://www.ada.gov/miami_university_cd.html; *Settlement Agreement Between United States and Byesville, Ohio, Guernsey County*, DJ No. 204-58-220 (May 19, 2016), https://www.ada.gov/byesville_sa.html; *Settlement Agreement Between United States and McLennan County, Texas*, DJ No. 204-76-199 (Nov. 16, 2015), https://www.ada.gov/mclennan_pca/mclennan_sa.html; Consent Decree, *United States v. Humboldt County*, No. 1:16-cv-5139 (Sept. 13, 2016), https://www.ada.gov/humboldt_pca/humboldt_ca_cd.html; *Settlement Agreement Between United States and Galveston County, Texas*, DJ No. 204-74-343 (Sept. 28, 2015), https://www.ada.gov/galveston_tx_pca/galveston_tx_sa.html; *Settlement Agreement Between United States and San Juan County, New Mexico*, DJ No. 204-49-86 (Sept. 28, 2015), https://www.ada.gov/san_juan_co_pca/san_juan_sa.html; *Settlement Agreement Between United States and the City of Cedar Rapids, Iowa*, DJ No. 204-27-41 (Sept. 1, 2015), https://www.ada.gov/cedar_rapids_pca/cedar_rapids_sa.html; *Settlement Agreement Between United States and Roberson County, North Carolina*, DJ No. 204-54-122 (July 29, 2015), https://www.ada.gov/robeson_co_pca/robeson_sa.html; *Settlement Agreement Between United States*

DOJ's ADA website, ADA.gov.  DOJ's consistent requirement that covered entities adhere to

WCAG 2.0 level AA to ensure ADA compliance has provided covered entities like Defendant

with sufficient notice of that standard.

    C.   Blue Apron's reliance on *AMC Entertainment* is misplaced.

---

*and Champaign County, Illinois*, DJ No. 204-24-116 (July 20, 2015),
https://www.ada.gov/champaign_pca/champaign_sa.html; *Settlement Agreement Between United States and Merced County, California*, DJ No. 204-11E-383 (July 20, 2015),
https://www.ada.gov/merced_co/merced_sa.html; *Settlement Agreement Between United States and Yakima County, Washington*, DJ No. 204-82-269 (July 20, 2015),
https://www.ada.gov/yakima_co_pca/yakima_sa.html; *Settlement Agreement Between United States and Pennington County, South Dakota*, DJ No. 204-69-49 (June 1, 2015),
https://www.ada.gov/pennington_co/pennington_sa.html; *Settlement Agreement Between United States and Chaves County, New Mexico*, DJ No. 204-49-85 (May 12, 2015),
https://www.ada.gov/chaves_county_pca/chaves_sa.html; *Settlement Agreement Between United States and the Village of Ruidoso, New Mexico*, DJ No. 205-49-24 (May 5, 2015),
https://www.ada.gov/ruidoso_sa.html; *Settlement Agreement Between United States and Nueces County, Texas*, DJ No. 204-74-348 (Jan. 30, 2015),
https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between United States and the Orange County Clerk of Courts*, DJ No. 204-17M-440 (July 17, 2014),
https://www.ada.gov/occ.htm; *Settlement Agreement Between United States and Blair County, Pennsylvania*, DJ No. 204-64-153 (Feb. 25, 2014), https://www.ada.gov/blair-co.htm; *Settlement Agreement Between United States and Louisiana Tech University and the Board of Supervisors for the University of Louisiana System,* DJ No. 204-33-116 (July 22, 2013),
https://www.ada.gov/louisiana-tech.htm; *Settlement Agreement Between United States and Lumpkin County, Georgia*, DJ No. 204-19-227 (undated),
https://www.ada.gov/lumpkin_co_pca/lumpkin_sa.html; *Settlement Agreement Between United States and Madison County, New York*, DJ No. 204-50-256 (undated),
https://www.ada.gov/madison_co_ny_pca/madison_co_ny_sa.html.

Title III cases: Consent Decree, *United States v. Greyhound Lines, Inc.*, No. 16-67-RGA (D. De. Feb. 10, 2016), https://www.ada.gov/greyhound/greyhound_cd.html; *Settlement Agreement Between United States and Carnival Corporation*, DJ No. 202-17M-206 (July 23, 2015),
https://www.ada.gov/carnival/carnival_sa.html; *Settlement Agreement Between United States and edX, Inc.*, DJ No. 202-36-255 (Apr. 2, 2015), http://www.ada.gov/edx_sa.htm; *Settlement Agreement Between United States and the National Museum of Crime and Punishment* (Jan. 13, 2015),
https://www.ada.gov/crime_punishment_museum/crime_punishment_sa.htm; *Settlement Agreement Between United States and Ahold U.S.A., Inc. and Peapod, LLC*, DJ No. 202-63-169 (Nov. 14, 2014), http://www.ada.gov/peapod_sa.htm; Consent Decree, *Nat'l Fed. of the Blind, et al., United States v. HRB Digital LLC and HRB Tax Group, Inc.*, No. 1:13-cv-10799 (March 25, 2014),
www.ada.gov/hrb-cd.htm.

In asserting that requiring it to comply with the law would violate its due process rights, Defendant relied heavily on *United States v. AMC Entertainment, Inc.* Def.'s Mem. at 9-10. Although *AMC* also involved a due process challenge to Title III enforcement, it is readily distinguishable from the case at hand. In *AMC*, DOJ sought to enforce 28 C.F.R. pt. 36, app. A, § 4.33.3 ("§ 4.33.3"), requiring movie theaters to provide "lines of sight comparable to those for members of the general public," which it interpreted as mandating provision of "comparable viewing angles to the screen." 549 F.3d at 763, 765. DOJ first announced its interpretation in a 1998 amicus brief and, in 1999, the Access Board announced that it was considering incorporating DOJ's interpretation into a final rule, but, as of 2008, had not done so. *Id.* at 764-765. The district court held, on summary judgment, that the defendant's theaters failed to comply with § 4.33.3 and ordered 96 multiplexes, containing 1,993 auditoria, to modify their design and architecture to provide equivalent viewing angles for wheelchair users. *Id.* at 762. The Ninth Circuit held that to the extent the injunction required modifications to multiplexes designed or built before the government first gave notice of its interpretation, it violated due process.

Defendant's reliance on *AMC* is misplaced. Def.'s Mem. at 9-10. First, § 4.33.3's "lines of sight" standard had proven to be ambiguous, with appellate courts split on its meaning. *AMC*, 549 F.3d at 764-767 (summarizing circuit split and noting that all courts agreed on the regulation's ambiguity). In light of this uncertainty, it was unfair to expect the defendant to have guessed which interpretation to follow. In the present case, however, there has been no similar ambiguity or split. An absence of specific technical guidance does not render the standards of full and equal enjoyment and effective communication ambiguous. *See, e.g.*, *Gorecki v. Hobby Lobby Stores, Inc.*, No. CV 17-1131-JFW(SKX), 2017 WL 2957736, at *6 (C.D. Cal. June 15,

2017) (finding, in distinguishing *AMC*, that "DOJ's general website accessibility requirement is not ambiguous because the DOJ has not imposed any specific means by which entities must meet this requirement and [entities] are free to decide how to comply with the ADA").

Second, in *AMC* the theater chain had received "approval for their stadium-seating theaters from multiple states, whose own programs had been certified by DOJ as 'meeting or exceeding' the federal requirements promulgated by the Access Board." *AMC*, 549 F.3d at 769 n.3. Here, there is no evidence that Defendant's website was certified as accessible by any government or that it was built before 1996, when DOJ made clear that the ADA applied to websites, or that the website has not been altered since then.

Finally, the holding in *AMC* did not undermine the district court's finding of liability, but rather concerned only the ordered remedial relief. *Id.* at 767 n.2. In explaining its due process concerns, the Ninth Circuit focused on evidence of how costly it would be to retrofit the theaters. *Id.* at 767-68. In contrast, the present case is at the pleadings stage. If there were any due process concerns in this case, they would not surface until Plaintiffs prevailed on the merits and the court were considering the scope of injunctive relief. *AMC* provides no support for dismissal at the pleadings stage. *See Fortyune v. City of Lomita*, 766 F.3d 1098, 1106 n.13 (9th Cir. 2014) (explaining "further consideration of the City's due process argument would be premature because due process constrains the remedies that may be imposed").

### III. Blue Apron inappropriately invokes the primary jurisdiction doctrine.

Defendant argues that the primary jurisdiction doctrine bars people with disabilities from seeking equal access to websites unless and until DOJ completes a regulatory process to specify exactly how covered entities must meet their existing obligations. Def.'s Mem. at 16. This is a

dangerous misapplication of the primary jurisdiction doctrine. The primary jurisdiction doctrine is a prudential, rather than jurisdictional, doctrine that "permits and occasionally requires a court to stay its hand while allowing an agency to address issues within its ken." *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 34 (1st Cir. 2003). Courts considering the doctrine should assess: "(1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether… the agency determination would materially aid the court.'" *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 172 (1st Cir. 1989). These factors "must be balanced against the potential for delay inherent in the decision to refer an issue to an administrative agency." *Am. Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl Prot.*, 163 F.3d 74, 81 (1st Cir. 1998). The doctrine "should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." *Harvard*, 2016 WL 3561622, at *13 (citing *Locust Cartgage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 340 n.5 (1st Cir. 1970)).

The issues in the current case do not lay at the heart of the task assigned to DOJ by Congress. DOJ is charged with issuing regulations, see 42 U.S.C. § 12186(b), rendering technical assistance, § 12206(c), and enforcing Title III in court, § 12188(b). The courts are the only entities with authority to issue injunctive relief under Title III. *See Harvard*, 2016 WL 3561622, at *15 (citing 42 U.S.C. § 12186(b)(1)(B)). Thus, even if DOJ specified a specific standard for websites to provide effective communication, this Court would have to determine whether Blue Apron was violating the ADA. *Id.* ("Referral to the DOJ will not resolve the question presented in this case: to what extent, if at all, the ADA ... require[s] these Defendants install captioning

and video description devices in their movie theaters. If and when DOJ issues a final rule, the Court must still determine at what point, if at all, installing captioning and video description devices imposes an undue burden on these Defendants.") (citing *Arizona ex rel. Goddard v. Harkins Admin. Servs.*, No. CV-07-00703-PHX-ROS, 2011 U.S. Dist. LEXIS 127682, at * 8 (February 8, 2011)).

Furthermore, because any finding on liability made by this Court would be specific to Blue Apron and its particular website, any declaratory and injunctive relief would apply only to Blue Apron. In cases where the result would be limited to the facts of the particular case, courts tend not to refer to the agency. *See Harvard*, 2016 WL 3561622, at *15 (because the relief would apply only to Harvard, the court's decision did not "run the risk of undermining the consistency of DOJ's regulatory interpretation"); *Atl. Salmon*, 339 F.3d at 34 ("the necessary focus upon the actions of two particular companies" weighs against primary jurisdiction doc-trine).

Nor does the risk that DOJ may change course and call for a less exacting standard than WCAG 2.0 necessitate referral. Even if this Court were to impose a burden on Blue Apron beyond what DOJ may eventually mandate, so long as it "does not rise to the level of undue, it would not run afoul of the ADA." *Harvard*, 2016 WL 3561622, at *15. *See also Baykeeper v. NL Indus., Inc*., 660 F.3d 686, 691-92 (3d Cir. 2011) (even if court "orders remediation that imposes an additional burden on [defendant], a more stringent remediation standard . . . is not a reason to invoke the primary jurisdiction doctrine") (internal quotation marks omitted); *Maine People's Alliance v. Holtrachem Mfg. Co., LLC*, No. Civ. 00-69-B-C, 2001 WL 1602046, at *8 (D. Me. Dec. 14, 2001) ("Extra burden is not what the doctrine is meant to circumvent; additional obligation is not incompatible with nor does it undermine the agency-driven process.").

### D. DOJ expertise is not required to unravel intricate technical facts.

Plaintiffs seek a "permanent injunction to cause a change in Defendant's corporate policies related to its web-based technologies so that Defendant's Website (defined herein) will become, and will remain, accessible." Compl. ¶ 1. Whether a defendant is required to make its website accessible to the blind is not "a particularly complicated issue that Congress has committed to a regulatory agency." *See GCB Commc'ns, Inc.*, 650 F.3d at 1264. The central questions for this Court to resolve are: (1) whether Title III covers virtual spaces such as Defendant's website; (2) whether Defendant fails to provide the blind with equally effective communication and/or an equal opportunity to use and enjoy its products and services through its website; and (3), if so, whether Defendant can establish either of the affirmative defenses of fundamental alteration or undue burden. *See* 28 C.F.R. §§ 36.201, 36.303. These are not complicated issues of first impression; instead, these are the sorts of questions courts regularly resolve.

Other courts rejecting the primary jurisdiction doctrine in the context of applying the ADA to new technology have reasoned that referral to DOJ would not be helpful or necessary in deciding the fact-specific inquiries typical of ADA cases. *See Harvard*, 2016 WL 3561622, at *15 (explaining, in declining to apply primary jurisdiction doctrine, that "it is the function of the court to decide whether a particular defendant has violated the ADA's prohibition against disability-based discrimination," which includes analyzing the undue burden defense); *Andrews*, 2017 WL 3278898, at *16 (declining to apply primary jurisdiction because "analyzing the text of the ADA and its regulations and deciding whether a business is in compliance with those laws is a task well within the competence of the judicial branch"); *Arizona ex rel. Goddard v. Harkins Admin. Servs.*, No. CV-07-00703-PHX-ROS, 2011 WL 13202686, at *3 (D. Ariz. Feb. 8, 2011)

21

(referral to DOJ to await a rule on movie captioning would "not resolve the question presented in this case: to what extent, if at all, the ADA . . . require[s] *these Defendants* install captioning and video description devices in *their* movie theaters" and "at what point, if at all, installing captioning and video description devices imposes an undue burden on *these Defendants*") (emphasis in original). The questions raised here are well within the Court's competence.

Furthermore, DOJ does not have the type of expertise that would prove helpful in this case. The primary jurisdiction doctrine is properly invoked in cases involving agencies with highly technical expertise. *See, e.g.*, *Verizon New England, Inc. v. Maine Public Utilities Com'n*, 509 F.3d 1 (1st Cir. 2007) (particularly complicated and technical issues "ought to be resolved by the expert agency"); *Locust*, 430 F.2d at 339 (primary jurisdiction is proper where "courts are confronted with issues of fact arising under a complex regulatory scheme outside their normal experience"); *Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 687 F. Supp. 20 (D. Mass. 1988). DOJ does not have special technical expertise in the areas of website coding or assistive technology. Indeed, in its ANPRM, DOJ specifically sought "input from experts in the field of computer science, programming, networking, assistive technology, and other related fields" given the "complexity" of the issue. *ANPRM*, 75 Fed. Reg. at 43,464. "If DOJ had specialized technical expertise, it would not need to solicit it from the outside." *Harvard*, 2016 WL 3561622, at *17. If the Court needs technical assistance, it could just as easily look to experts for guidance.

E. The agency determination would not materially aid the Court.

Referral to DOJ on the issue of whether a covered website must provide equal access would not aid the Court because DOJ's position is clear. DOJ has consistently asserted that websites are covered by the ADA and that a covered entity can ensure its website provides equal

access by adhering to WCAG 2.0 level AA. *See* discussion *supra* Section II.B. Thus, DOJ's well-known views on this issue obviate the need for referral. *See Harvard*, 2016 WL 3561622, at *19 ("The DOJ's consistently stated position cannot be squared with the notion that, until DOJ issues specific regulations governing website accessibility, if it ever does, public accommodations such as Harvard may discriminate against the disabled in connection with the goods, services, facilities, privileges, accommodations, and advantages they offer via the internet.").

In addition, whether a covered entity must meet WCAG 2.0 to comply with Title III has not been a divisive issue. Some courts have required entities to comply with WCAG 2.0 level AA, and no court has ever ruled that this standard is an inappropriate means of ensuring ADA compliance or should not be used. *See Gil v. Winn-Dixie Stores, Inc.*, No. CV 16-23020-CIV, 2017 WL 2547242, at *9 (S.D. Fla. June 12, 2017) (requiring website to conform to WCAG 2.0); *Hindel v. Husted*, No. 2:15-CV-3061, 2017 WL 432839, at *7 (S.D. Ohio Feb. 1, 2017) (requiring state website to meet WCAG 2.0 AA). There is simply no evidence that courts' use of WCAG will create a problem of uniformity. If a case arises where adherence to WCAG 2.0 does not ensure equal access, it will be a fact-specific result, related to the nature of someone's disability or the specific service offered. The implications would not affect the over-all uniformity of the administration of Title III. *See Harvard*, 2016 WL 3561622, at *15 ("Findings on the issues of undue burden and fundamental alteration would be specific to Harvard and the service it is alleged to be providing. Any declaratory and injunctive relief would apply only to Harvard.").

F. Referral to DOJ would not promote efficiency and would prejudice persons with disabilities.

Efficiency weighs heavily against dismissal on primary jurisdiction grounds. *See Harvard*, 2016 WL 3561622, at *19 ( "[t]here is a 'strong public interest in the prompt resolution

23

of the case,' and it would be inappropriate to 'defer to administrative action of uncertain aid and uncertain speed'") (quoting *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 581 (1st Cir. 1979)).  DOJ issued an ANPRM on web regulations seven years ago, *ANPRM*, 75 Fed. Reg. 43,460-01, but has made no movement to issue new Title III regulations.  DOJ Regulations Under Development, https://www.ada.gov/newproposed_regs.htm (describing rulemaking history) (last visited July 24, 2017).  DOJ recently put its web regulations on the Inactive Actions list.  Current Unified Agenda of Regulatory and Deregulatory Actions, 2017 Inactive Actions list, https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf  (RIN 1190-AA61).  The Eastern District of New York recently found that DOJ's inaction weighs against applying primary jurisdiction. *See Andrews*, 2017 WL 3278898, at *17 ("The court will not delay in adjudicating [plaintiff's] claim on the off-chance the DOJ promptly issues regula-tions it has contemplated issuing for seven years but has yet to make significant progress on.").  Dismissal for referral to DOJ is therefore highly inefficient.  *See Am. Auto. Mfrs. Ass'n*, 163 F.3d at 81-82 ("In cases where the potential for delay is found to be too great to justify a straight-forward referral, the court may, in its discretion, either choose not to refer the matter to the agency, or take such other action as it deems appropriate."); *Gorecki*, 2017 WL 2957736, at *7 (because DOJ "has not taken any further action towards promulgating specific accessibility requirements and there is no reason to believe the department will issue rules any time in the near future," the "potential for delay while the federal administrative rulemaking process proceeds is great" and weighs against invoking the primary jurisdiction doctrine).

Referral to DOJ in the face of agency inaction would be prejudicial to Plaintiffs and others seeking equal access to websites.  The ADA, since 1990, has required public accommo-

dations to offer services and goods to people with disabilities in an equal manner. 42 U.S.C. §

12182. Dismissing website accessibility cases in the hope that, against all signs to the contrary,

DOJ will act soon to specify a technical standard, would place the civil rights of people with

disabilities on indefinite hold. *See Harvard*, 2016 WL 3561622, at *20 (because, if plaintiffs'

ADA claims are valid, they "will continue to be unlawfully harmed until this case is resolved[,] .

. . extending the period of time Plaintiffs must wait for a possible remedy through imposition of a

stay would be prejudicial"). This is particularly so because DOJ does not offer an administrative

hearing process; individuals with disabilities can only seek a remedial order from the courts. *See*

*Arizona ex rel. Goddard*, 2011 WL 13202686, at *3 (because "DOJ does not have an ad-

ministrative process in which these parties can directly participate to resolve their dispute,"

dismissal under primary jurisdiction is inappropriate).

## CONCLUSION

Because Defendant's website is covered under Title III, and neither the Due Process

clause nor the primary jurisdiction doctrine requires people with disabilities to suspend their

right to equal enjoyment of such websites, this Court should reject the motion to dismiss.


Respectfully submitted,

| _/s/ Lawrence A. Vogelman_<br>Lawrence A. Vogelman (NH Bar #10280)<br>Nixon Vogelman Barry Slawsky & Simoneau<br>77 Central St.<br>Manchester, NH 03101<br>603-669-7070<br>lvogelman@davenixonlaw.com<br><br>*Counsel for Amicus Curiae*<br>*National Federation of the Blind* | ___/s/ Eve L. Hill_____<br>Eve L. Hill*<br>Emily Levenson*<br>BROWN, GOLDSTEIN & LEVY, LLP<br>120 E. Baltimore Street, Suite 1700<br>Baltimore, Maryland 21202<br>Tel: (410) 962-1030<br>ehill@browngold.com<br>elevenson@browngold.com<br>*Admitted Pro Hac Vice* |
|---|---|

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of New Hampshire by using the appellate CM/ECF system on September 15, 2017. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

   /s/ Lawrence A. Vogelman
Lawrence A. Vogelman
